IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION


JOHN WILLIAM SCHARNHORST, III                                    PLAINTIFF


v.                    Civil No. 5:22-CV-05176-TLB-CDC


CHIEF DEPUTY JAY CANTRELL, Washington County
Detention Center (WCDC); MAJOR RANDALL DENZER,
WCDC; CORPORAL TOM MULVANEY, WCDC;
CORPORAL SAM CAUDLE, WCDC; DEPUTY TYLER BECK,
WCDC; DEPUTY PHIPPS, WCDC; DEPUTY RAINES, WCDC;
SERGEANT WELCHEL, WCDC; CORPORAL CARPENTER, WCDC;
DEPUTY MISENHIMER, WCDC; DEPUTY SELF, WCDC;
CORPORAL DOMINIC NUNZIATO, WCDC;
DEPUTY LEEN, WCDC; DEPUTY REDMOND, WCDC;
DEPUTY FRYE, WCDC; DEPUTY EDGE, WCDC;
CORPORAL KRADDUCK, WCDC;
DEPUTY NUNZIATO (FIRST NAME UNKNOWN), WCDC; and
SGT. PINEDA,

                                                              DEFENDANTS


**MAGISTRATE'S REPORT AND RECOMMENDATION**

*Pro se* Plaintiff John William Scharnhorst, III, filed the above-captioned civil rights action

under 42 U.S.C. § 1983.[1]  Pursuant to the provisions of 28 U.S.C. §§ 636(b)(1) and (3), the

Honorable Timothy L. Brooks, United States District Judge, referred this case to the undersigned

---

[1]      This is one of seven actions Plaintiff has initiated in this District. *See Scharnhorst v. Cantrell, et al.*, Case No. 5:22-cv-05138-TLB-CDC (W.D. Ark. July 15, 2022); *Scharnhorst v. Helder et al.*, Case No. 5:22-cv-05167-TLB-CDC (W.D. Ark. Aug. 10, 2022); *Scharnhorst v. Cantrell et al.*, Case No. 5:22-cv-05218-TLB-CDC (W.D. Ark. Oct. 19, 2022); *Scharnhorst v. Cantrell et al.*, Case No. 5:22-cv-05232-TLB-CDC (W.D. Ark. Nov. 28, 2022); *Scharnhorst v. Cantrell et al.*, Case No. 5:22-cv-05238-TLB-CDC (W.D. Dec. 14, 2022); *Scharnhorst v. Ake et al.*, Case No. 5:22-cv-05243-TLB-CDC (W.D. Ark. Dec. 19, 2022).

1

for the purposes of making a Report and Recommendation on Defendants' Motion for Summary Judgment. (ECF No. 48).   Plaintiff filed a response, including an affidavit and statement of disputed facts, (ECF Nos. 69-71) and Defendants replied.   (ECF No. 72).   This matter is therefore ripe for the Court's consideration.   Upon review of the entire record and for the reasons detailed below, this Court recommends that Defendants' Motion for Summary Judgment be GRANTED and that this action be DISMISSED.

## BACKGROUND

This case is about the Defendants' efforts (or lack thereof) to protect WCDC inmates, specifically Plaintiff, from COVID-19 between November 18, 2021, and March 10, 2022. (ECF No. 7).   According to Plaintiff, Defendants' failure to comply with and enforce a mask mandate at the WCDC caused him to contract COVID-19 in January 2022 and become "violently ill." *Id.* Defendants say there is no material fact in dispute on this claim, and thus, they are entitled to judgment as a matter of law pursuant to Rule 56 of the Federal Rules of Civil Procedure. (Mtn. Summ. Judg. ¶¶ 3-4 (ECF No. 48)). Plaintiff disagrees. *See generally* (Resp. (ECF No. 69).   When considering summary judgment, the court must take the non-movant's version of events as true unless it is "blatantly contradicted by the record." *Scott v. Harris*, 550 U.S. 372, 380 (2007).   This Court, then, first considers Plaintiff's version of events.

### A.    Plaintiff's Version

Plaintiff contends[2] that during the timeframe alleged in the Amended Complaint – November 18, 2021, to March 10, 2022 – WCDC policy required WCDC staff to wear face masks

---

[2]    Plaintiff's version of events is drawn from his verified Amended Complaint and affidavit. (ECF Nos. 7, 71).

covering their nose and mouth. *See* (Amend. Comp. p. 4 (ECF No. 7)).   According to Plaintiff, during that timeframe, Defendants Caudle, Beck, Phipps, Raines, Carpenter, Misenhimer, Self, Nunziato, Nunziato (first name unknown), Frye, Leen, Redmond, Edge, Kradduck, and Welchel either failed to properly wear a mask over their nose and mouth in accordance with COVID-19 prevention policy, or failed to wear a mask at all. *Id.* Plaintiff says when he requested that these defendants comply with their COVID-19 policy, Defendants refused. *Id.* Additionally, Plaintiff says that, in response to his requests that Defendants properly wear face coverings, Defendant Beck mocked him, Defendant Misenhimer threatened him, and Defendant Phipps insulted him. *Id.* Plaintiff contends that from December 17, 2021, until March 10, 2022, he filed grievances almost daily reporting the failures of WCDC staff to properly wear face coverings in accordance with COVID-19 policy, but nevertheless, Defendants Chief Deputy Cantrell, Major Denzer, Sergeant Pineda, and Corporal Mulvaney failed to properly supervise or train the staff, resulting in Plaintiff contracting COVID-19 and suffering severe illness and emotional distress. *Id.*

Plaintiff asserts that in 2014 and 2015, he "studied infectious diseases with an emphasis on virology and epidemiology under the private instruction of Dr. Jose Romero, who was the Secretary of the Arkansas Department of Health during the COVID-19 pandemic." (Aff. Scharnhorst ¶ 1 (ECF No. 70)).   According to Plaintiff, "[his] relationship with Dr. Romero is of a professional nature, [they] met frequently and privately in a one-on-one setting and [he] was educated on the nature of viruses, replication, mutation, transmission, the history of epidemics, bio-weaponry, germ warfare, prevention strategies, vaccines, etc." *Id.* Given this background, Plaintiff contends that "at the time of [his] incarceration at the WCDC from November 18, 2021, to January 17, 2023 [his] understanding of the risks presented by COVID-19 was on par with any

3

of the defendants, or anyone else at the Washington County Sheriff's Department, and likely that of Dr. Karas' staff as well."[3] *Id.*

Plaintiff claims that he started warning WCDC staff and Karas Medical personnel about the dangers of the COVID-19 omicron variant in mid-December 2021, but WCDC management failed to heed these warnings and did not properly train and supervise WCDC staff to ensure that COVID-19 prevention policies were being followed. *Id.* ¶¶ 2-3. Plaintiff asserts that from December 17, 2021, to March 9, 2022, his requests for WCDC to follow COVID-19 prevention policies by properly wearing a mask "were met with aggressive and threatening remarks of defiance." *Id.* ¶ 6. Plaintiff says that when he filed grievances about WCDC staff failing to properly wear face coverings, management repeatedly told him that they would "remedy the problem and enforce the face covering policy, but that never happened." *Id.* ¶ 7; *see generally* (Pl. Ex. Z (ECF No. 71)).

According to Plaintiff, after he heard that the inmates housed in the R-block had been infected with COVID-19 on or about January 10, 2022, he increased his efforts requesting that

---

[3]     In their Reply, Defendants object to Plaintiff's affidavit to the extent that his affidavit could "be construed as suggesting that [he] is or was qualified as an expert in virology or epidemiology." (Def. Reply ¶ 5 (ECF No. 72)). Rule 702 of the Federal Rules of Evidence governs the admissibility of expert testimony. That Rule provides, in pertinent part, that "a witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise" if certain criteria are met. *See* Fed. R. Evid. 702. Plaintiff claims, for example, that he met "frequently and privately in a one-on-one setting" with Dr. Jose Romero and that he was "educated on the nature of viruses, replication, mutation, transmission, the history of epidemics, bio-weaponry, germ warfare, prevention strategies, etc." (Scharnhorst Aff. ¶ 1 (ECF No. 70)). But Plaintiff's affidavit does not provide adequate or sufficient detail for the Court to determine whether this "training" in 2014-2015, five years *before* the COVID-19 pandemic, qualifies him as an expert on COVID-19, the transmission of COVID-19 in correctional settings, or effective COVID-19 prevention strategies. Accordingly, Defendants' objection is granted: in considering the Defendants' Motion for Summary Judgment, this Court does not view Plaintiff's affidavit as "expert testimony" within the meaning of Rule 702.

WCDC staff comply with COVID-19 prevention policy by properly wearing face coverings. *Id.* ¶ 8.  Plaintiff contends that on January 20, 2022, he (and approximately 20 other inmates) tested positive for COVID-19. *Id.* ¶ 9.   Plaintiff says that at the time of diagnosis, his symptoms were relatively minor, so he did not believe that the medication that was being offered was necessary. *Id.*   Plaintiff explains that he was also suspicious of Dr. Karas' medical staff because he (and other inmates) was aware that they had been treating inmates with ivermectin without inmates' knowledge or consent.[4] *Id.* ¶ 10.   But Plaintiff says that when his symptoms grew worse over the following days, Dr. Karas medical staff denied his request for the pain medication and an antibiotic that he had been prescribed. *Id.*   According to Plaintiff, he was eventually treated by a paramedic on January 31, 2022, after he grew lethargic and became unconscious. *Id.*   But despite the paramedic's assurances that Plaintiff would get his prescribed medication, Plaintiff says he never received it. *Id.*

During this period from mid-December 2021 to January 20, 2022, Plaintiff asserts that the COVID-19 omicron variant was at its peak, then-Arkansas Governor Asa Hutchinson was holding daily news conferences, and Dr. Romero was regularly on TV stressing the importance of wearing masks to prevent the transmission of COVID-19. *Id.* ¶ 11.   Plaintiff says that he wrote letters to Defendants Jay Cantrell and Major Denzer informing them of the risks to the WCDC inmate population from WCDC staff's failure to properly wear face coverings – or wear them at all. *Id.* ¶ 12.   According to Plaintiff, between November 18, 2021, and March 9, 2022, "if an inmate met

---

[4]      The allegations against Dr. Karas medical staff for purportedly administering ivermectin, a drug FDA-approved to treat parasitic infestations, i.e., worms, to WCDC inmates without their knowledge or consent was the subject of a separate federal lawsuit which has been settled. *Floreal-Wooten, et al. v. Helder, et al.*, Case No. 5:22-CV-5011-TLB (W.D. Ark. Jan. 13, 2022).

with a doctor, went to court, or even sat with an attorney separated by a glass partitian [sic], the inmate was removed from general population and placed in quarantine for 14 days." *Id.* ¶ 13.   But "despite [his] relentless efforts, the management showed indifference and failed to properly train and supervise the guard staff resulting in a widespread and accepted custom of disregarding COVID prevention policies such as face coverings and intense disinfecting practices." *Id.* ¶ 3.

### B. Defendants' Version

Defendants assert that during the COVID-19 pandemic, "it was the policy of the Washington County Detention Center to follow the guidance of [their] third-party medical staff regarding quarantine or mask usage." (Aff. Mulvaney ¶ 20 (ECF No. 50-1)).   According to Defendants, "[a]t the beginning of the COVID-19 pandemic, the Washington County Detention Center implemented a COVID-19 Management Plan." *Id.* ¶ 21.   This plan "implemented information and guidance provided by the CDC and the Arkansas Department of Health for the protection against the introduction or spread of COVID-19 at the Washington County Detention Center." *Id.* (citing Def. Ex. A11, COVID-19 Management Plan (ECF No. 50-12)) ("COVID-19 Management Plan").

The COVID-19 Management Plan requires persons entering the WCDC to be screened and also mandates the implementation of cleaning practices consistent with CDC recommendations. (COVID-19 Management Plan (ECF No. 50-12)).   Prior to starting their shift, staff must complete a screening process intended to "identify persons with a fever of 100 degrees Fahrenheit or greater, cough, shortness of breath, known exposure to the COVID-19 virus, travel to a high-risk area/ country in 14 days." *Id.*   According to policy, any staff with a fever (100 degrees Fahrenheit or greater) or "answering yes to 2 or more questions will need to return home and contact their

supervisor and health care provider for further instructions." *Id.*   Further, each employee is required to "wash hands with anti-bacterial soap prior to starting their assigned shift." *Id.* Arresting officers must also complete a screening prior to bringing an arrestee into the WCDC. *Id.*

Arrestees must also be screened prior to entering the WCDC. *Id.*   Arrestees are screened based on the same criteria as staff. *Id.*   "Any person with a fever (100 degrees Fahrenheit or greater) or answering yes to 2 or more questions will need to put on a mask. The only person requiring a mask is the person identified by the screening as at risk for COVID-19." *Id.*   Arrestees identified as high risk for COVID-19 and who are also "symptomatic" may be seen at the local hospital for treatment. *Id.*   "All other high-risk arrestees will be provided a mask and a cell separated from general population to minimize contact with others." *Id.*   The detainee will remain isolated until his COVID-19 test results are back. *Id.*

Further, pursuant to policy, "[e]nvironmental cleaning will continue to follow the CDC recommended cleaning practices." *Id.*

According to the Defendants, "[w]hen the Governor of Arkansas lifted the indoor mask mandate in March 2021, the Washington County Detention Center also lifted its general mask mandate for employees." (Aff. Mulvaney ¶ 26 (ECF No. 50-1)). "After the mask mandate was lifted at the WCDC, masks were only required to be worn by staff when interacting with a COVID-19 positive inmate, and that was for the protection of the staff member." *Id.* ¶ 27.   Further, Defendants assert that "[i]t is the policy of the Washington County Detention Center that all inmates have a right to humane treatment which provides for nourishing food, access to medical and dental care when indicated, clean living quarters, and a healthy, safe, and secure environment." *Id.* ¶ 13 (citing Def. Ex. A5, Policies and Procedures (ECF No. 50-11)).

Plaintiff was booked into the Washington County Detention Center (WCDC) on November 18, 2021. (Def. Ex. A1, Arrest and Booking (ECF No. 50-2)). On that same day, he went through the COVID-19 screening process, answered "no" to all the questions, and did not present with a fever. (Def. Ex. A3, Jail Medical File Information, p. 1 (ECF No. 50-4)).[5]  Plaintiff's WCDC medical file includes a notation dated December 3, 2021, by Kelley Hinely, saying "COVID Vaccine Refused." *Id.* p. 4. Plaintiff's medical file also includes an "informed consent for medication treatment of COVID-19" form. *Id.* pp. 2-3.  This form, dated January 20, 2022, reflects that Plaintiff refused medication for the treatment of COVID-19 symptoms.  *Id.*; *see also* (Beck Aff. ¶ 9 (ECF No. 50-18)).

## LEGAL STANDARD

The court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A dispute is genuine if the evidence is such that it could cause a reasonable jury to return a verdict for either party." *Ward v. Olson*, 939 F. Supp. 2d 956, 961 (D. Minn. 2013) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)).  A fact is material only when its resolution would affect the outcome of a case. *Anderson*, 477 U.S. at 248.

Further, the moving party bears the initial burden of identifying "those portions of the record which it believes demonstrate the absence of a genuine issue of material fact." *Jackson v. United Parcel Serv., Inc.*, 643 F.3d 1081, 1085 (8th Cir. 2001).   In response, the nonmoving party "may not rest upon mere denials or allegations, but must instead set forth specific facts sufficient

---

[5]     Defendants' exhibits are not consecutively paginated. Accordingly, this Court refers to the CM/ECF page numbers at the top of each page throughout this report and recommendation.

to raise a genuine issue for trial." *Forrest v. Kraft Foods, Inc.*, 285 F.3d 688, 691 (8th Cir. 2002). In considering a summary judgment motion, the court views all the evidence and inferences in the light most favorable to the nonmoving party. *Anderson*, 477 U.S. at 255.

## ANALYSIS

Plaintiff's Amended Complaint asserts several claims regarding the Defendants' failure to properly wear masks and the Defendants' failure to train and enforce WCDC masking policies. (Amend. Comp. (ECF No. 7)).   Plaintiff identifies the Defendants in their individual and official capacities. *Id.*   For their part, the Defendants construe Plaintiff's claims as alleging: (1) failure to follow WCDC mask policies; (2) unconstitutional conditions of confinement; (3) failure to protect; (4) violation of his constitutional rights by Defendants Beck, Misenhimer, and Phipps by mocking him (Beck), threatening him (Misenhimer), and insulting him (Phipps) when Plaintiff confronted them about their failure to properly wear face masks; (6) outrage by Defendant in failing to properly wear masks; and (7) failure to properly supervise and train the WCDC staff regarding the WCDC mask policy[6] by Defendants Chief Deputy Jay Cantrell, Major Randall Denzer, and Corporal Tom Mulvaney. (Mtn. Summ. J. (ECF No. 48)).   Defendants contend that they are entitled to summary judgment and qualified immunity as to all claims.

---

[6] In Plaintiff's response to Defendants' Motion for Summary Judgment, he contends that Dr. Karas medical staff, purportedly the provider of medical services for the WCDC, did not provide him with adequate medical care. (Scharnhorst Aff. ¶ 10 (ECF No. 70)). Neither Dr. Karas nor any member of his medical staff is listed as a defendant to this action. Further, the Amended Complaint – even when liberally construed – fails to assert a claim against Dr. Karas and his medical staff. The Court will not consider such new claims for the first time in response to Defendants' Motion for Summary Judgment. *See N. State Power Co. v. Fed. Transit Admin.*, 358 F.3d 1050, 1057 (8th Cir. 2004) ("Thus, while we recognize that the pleading requirements under the Federal Rules are relatively permissive, they do not entitle parties to manufacture claims, which were not pled, late into the litigation for the purpose of avoiding summary judgment.").

## I.      QUALIFIED IMMUNITY

To determine whether the Defendants are entitled to qualified immunity, this Court conducts a two-part inquiry: "(1) whether the facts, viewed in the light most favorable to [Plaintiff], demonstrate the deprivation of a constitutional or statutory right; and (2) whether the right was clearly established at the time of the deprivation." *Ryno v. City of Waynesville*, 58 F.4th 995, 1004 (8th Cir. 2023). "[Q]ualified immunity protects all but the plainly incompetent or those who knowingly violate the law." *Id.* (quoting *City of Tahlequah v. Bond*, __ U.S. __, 142 S.Ct. 9, 11 (2021) (per curiam)). "If [the court] conclude[s] that the alleged facts do not violate a constitutional right, then [the court] need not address the second inquiry, and the defendant[s] will be entitled to qualified immunity." *Id.* (quoting *Groenewold v. Kelley*, 888 F.3d 365, 371 (8th Cir. 2018)).   The Court first turns to Plaintiff's constitutional claims.

### A. Constitutional Claims

#### 1.   Failure to Comply with Policy

Plaintiff contends that the Defendants failed to comply with the WCDC mask policy from November 18, 2021, to March 10, 2022, causing him to contract COVID-19 and become "violently ill." (Amend. Comp. (ECF No. 7)).   But even if true, a staff member's failure to follow policy – *in itself* –is not sufficient to establish a cognizable claim under 42 U.S.C. § 1983. *See Phillips v. Norris*, 320 F.3d 844, 847 (8th Cir. 2003) ("there is no federal constitutional liberty interest in having . . . prison officials follow prison regulations").   Thus, to the extent that the parties dispute what WCDC's COVID-19 policy requires and whether the Defendants properly implemented those policies, such disputes are immaterial because Plaintiff does not have a constitutional right to require staff to follow detention center policy in the first place. *See Erickson v. Nationstar*

10

*Mortgage, LLC*, 31 F.4th 1044, 1048 (8th Cir. 2022) ("A fact is material if it may affect the outcome of the suit.") (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).   All Defendants, therefore, should be entitled to summary judgment on Plaintiff's claim that they failed to follow WCDC mask policy from November 18, 2021, to March 10, 2022.

### 2. Failure-to-Protect and Unconstitutional Conditions-of-Confinement

As the Court understands it, the core of Plaintiff's claim is that the Defendants failed to take adequate COVID-19 precautions, namely, they failed to properly wear face masks, thereby exposing him to risk of harm, i.e., COVID-19. (Amend. Comp. (ECF No. 7)).   Indeed, Plaintiff claims he contracted COVID-19 because of these failures and became "violently ill." *Id.* Defendants characterize these allegations as "failure to protect" and "unconstitutional confinement" claims.   This Court does the same.

### i.    WCDC COVID-19 Mask Policy

The Court first considers the origins of Plaintiff's contention that WCDC policy requires staff to wear masks.

Plaintiff asserts that the WCDC policy required the Defendants to wear masks during the timeframe alleged in the Amended Complaint, but that they either failed to wear masks or failed to properly wear them. (Amend. Comp. (ECF No. 7)).   In support, Plaintiff notes that on December 23, 2021, he asked for the WCDC face covering policy for the jail guards and medical staff, and received the following response from Defendant Mulvaney:

> *Officers are to be wearing a face covering within close proximity of other detainees, and this does not mean earing it on their chin, or just covering their mouth, it should be covering their mouth and nose at the same time to be correct.* As for medical staff, they are contracted, and not employed by WCDC. They may have different directives to follow under their own procedures. Although, k would assume it is the same or very close. You would need to submit a request under medical services to

11

find out for sure. Cpl. Mulvaney.

(Pl. Ex. Z, p. 1 (ECF No. 71)) (emphasis added).[7]

On March 8, 2022, Plaintiff asked whether the WCDC COVID policy had changed. In response, Defendant Mulvaney explained, in part:

> *Yes, masks are still to be worn by the staff.*

(Def. Ex. A2, Requests and Grievances, p. 50 (ECF No. 50-3)) (emphasis added).

By contrast, Defendant Mulvaney's affidavit in support of summary judgment provides,

> When the Governor of Arkansas lifted the indoor mask mandate in March 2021, the Washington County Detention Center also lifted its general mask mandate for employees.   After the mask mandate was lifted at the Washington County Detention Center, masks were only required to be worn by staff members when interacting with a COVID-19 positive inmate, and that was for the protection of the staff member.

(Aff. Mulvaney, Ex. A ¶¶ 26-27 (ECF No. 50-1)).[8]

The affidavits of Chief Deputy Cantrell and Major Randall Denzer assert the same.  *See* (Aff. Cantrell, Ex. B, ¶¶ 9-10 (ECF No. 50-13)); (Aff. Denzer, Ex. C, ¶¶ 10-11 (ECF No. 50-14)).

For its part, the Washington County Detention Center COVID-19 Management Plan does little to clarify WCDC's policy on face coverings. (Def. Ex. A11, COVID-19 Management Plan (ECF No. 50-12)).   Although Defendant Mulvaney's affidavit states that the WCDC's COVID-19 Management Plan was implemented at the "beginning of the COVID-19 pandemic," (Aff.

---

[7]     Plaintiff's "Exhibit Z," like Defendants' "Exhibit A2," (ECF No. 50-3), consists of Plaintiff's kiosk submissions, including his grievances regarding WCDC staff's failure to wear masks or to wear them properly.   Even though the exhibits do not contain the same kiosk submissions, because it is clear that each consists of portions of the facility's business records, the Court gives both exhibits equal weight. *See* Fed. R. Evid. 803(6).

[8]     Defendants fail to confront—let alone explain—the discrepancy between Defendant Mulvaney's response to Plaintiff's inquiries about the WCDC face covering policy and his affidavit.

Mulvaney, Ex. A, ¶ 21 (ECF No. 50-1)), the plan itself is undated. (Def. Ex. A11, (ECF No. 50-12)). Further, while the WCDC COVID-19 Management Plan was prepared "after reviewing the information provided by the CDC and Arkansas Department of Health," the plan does not specify whether the policies contained therein followed or complied with those recommendations. *Id.* Regarding masks, the plan provides that only arrestees "at high risk for COVID-19" are required to wear a mask. *Id.* The plan is completely silent on requirements or recommendations for staff to wear masks, or how to properly wear a mask. *Id.*

Further, although Defendants Mulvaney, Cantrell, and Denzer assert in their affidavits that the WCDC COVID-19 mask policy was tied to the Governor's mask mandate, the WCDC's COVID-19 Management Plan does not reference the Governor's mask mandate. *See* (Def. Ex. A11, (ECF No. 50-12)). Indeed, despite the Defendants' purported reliance on the Governor's mask mandate in establishing WCDC policy, the Defendants fail to cite to that mandate, or when that mandate was lifted.

Even so, public records show that on July 16, 2020, Governor Hutchinson issued a mask mandate by Executive Order 20-43, directing the Arkansas Secretary of Health to issue a public health directive "requiring every person in Arkansas to wear a face covering over the mouth and nose in all indoor environments where they are exposed to non-household members and distancing of six (6) feet or more cannot be assured . . .," absent specific, delineated exceptions. (Exec. Order No. 20-43, Executive Order Pursuant to the Public Health Emergency Concerning COVID-19, As Declared in Executive Order 20-37, For the Purpose of Requiring Face Coverings (July 16, 2020), *available at* Arkansas Documents Digital Collections, Arkansas State Library, https://cdm16039.contentdm.oclc.org/digital/collection/p15021coll1/id/3617 (last accessed Sept.

21, 2023).[9] Incarcerated persons and persons working in a correctional setting are not explicitly exempted from the mask mandate. *Id.*   Pursuant to Executive Order 21-03, Governor Hutchinson extended the face covering directive set forth in Executive Order 20-43, but explained that "prior to March 31, 2021, the Governor, in consultation with the Secretary of Health, will determine whether the 'Face Coverings Directive' should be converted to a public health guideline consistent with the ability to control transmission of the virus in this state." (Exec. Order No. 21-03, Executive Order to Renew the Disaster and Public Health Emergency to Mitigate the Spread and Impact of COVID-19 (Feb. 26, 2021), *available at* Arkansas Documents Digital Collections, Arkansas State Library,   https://cdm16039.contentdm.oclc.org/digital/collection/p15021coll1/id/3759   (last accessed Sept. 21, 2023).   On March 31, 2021, by Executive Order 21-07, Governor Hutchinson again extended the "disaster and public health emergency to mitigate the spread and impact of COVID-19. (Exec. Order No. 21-07, Executive Order to Renew the Disaster and Public Health Emergency to Mitigate the Spread and Impact of COVID-19 (March 31, 2021), *available at* Arkansas    Documents    Digital    Collections,    Arkansas    State    Library, https://cdm16039.contentdm.oclc.org/digital/collection/p15021coll1/id/3780 (last accessed Sept. 21, 2023).   But this Order did *not* explicitly extend the face mask mandate. *Id.*   Reading these Executive Orders together, therefore, the Court finds that the Arkansas mask mandate was lifted on or about March 31, 2021.

Thus, it is clear that Plaintiff had reason to believe WCDC policy required staff to wear

---

[9]     The Court takes judicial notice of Governor Hutchinson's Executive Orders. *See* Fed. R. Evid. 201(b)(2) (providing that the court may take judicial notice of a fact that is not subject to reasonable dispute because it can be "accurately and readily determined from sources whose accuracy cannot reasonably be questioned").

masks during the timeframe at issue because Defendant Mulvaney *told* him that was the case.   The fact that Defendants now claim that WCDC staff had not been required to wear masks since March 2021, eight months before Plaintiff was booked into the WCDC and ten months before he contracted COVID-19, is perplexing and certainly gives rise to a fact dispute.   But, for the reasons outlined below, that dispute is not material to Plaintiffs' claims.

### ii.   Failure to Protect

Because Plaintiff was a pretrial detainee during the timeframe in question, his failure-to-protect claim arises under the Fourteenth Amendment. *Perry v. Adams*, 993 F.3d 584, 587 (8th Cir. 2021).   In the Eighth Circuit, however, courts apply the same Eighth Amendment analysis to failure to protect claims brought by pretrial inmates as those brought by convicted prisoners. *Perkins v. Grimes*, 161 F. 3d 1127, 1129-30 (8th Cir. 1998).

Pursuant to that analysis, "[a] prison official violates the Eighth Amendment by being deliberately indifferent either to a prisoner's existing serious medical needs or to conditions posing a substantial risk of serious future harm." *Weaver v. Clarke*, 45 F.3d 1253, 1255 (8th Cir. 1995) (comparing *Estelle v. Gamble*, 429 U.S. 97, 104 (1976) (existing medical needs) with *Helling v. McKinney*, 509 U.S. 25 (1993) (risk of future harm). "To show deliberate indifference, the [inmate] must prove both that the official's acts objectively caused a sufficiently serious deprivation and that the official had a subjectively culpable state of mind." *Perkins v. Grimes*, 161 F.3d 1127, 1130 (8th Cir. 1998) (citation omitted).

The first question, then, is objective: whether Plaintiff has demonstrated, from an objective standpoint, that he was incarcerated at the WCDC under "conditions posing a substantial risk of harm." *Smith v. Ark. Dept. of Corr.*, 103 F. 637, 644 (8th Cir. 1996).   This factor "requires more

15

than a scientific and statistical inquiry into the seriousness of the potential harm and the likelihood that such injury to health will actually be caused by [the disease]." *Helling v. McKinney*, 509 U.S. 25, 35 (1993). "It also requires a court to assess whether society considers the risk that the prisoner complains of to be so grave that it violates contemporary standards of decency to expose *anyone* unwillingly to such a risk." *Id.*

In this Circuit, courts have previously found that COVID-19 "poses an objectively serious medical risk" to inmates, particularly, but not exclusively, where an inmate is at "high risk" for contracting the disease. *See, e.g.*, *Choate v. Runion*, Case No. 4:20-cv-04109, 2022 WL 3908836, at * 6 (W.D. Ark. Aug. 30, 2022) ("The Court is keenly aware of the significant health risks associated with COVID-19 and the ease with which this disease is transmitted, especially in a prison setting.") (quoting *Tate v. Arkansas Dept. of Corr.*, Case No. 4:20-cv-0558, 2020 WL 7378805, at * 8 (E.D. Ark. 9, 2020), *report and recommendation adopted by* 2022 WL 17862242 (W.D. Ark. Dec. 22, 2022), *Heggs v. Dept. of Corr.*, Case No. 20-cv-2302 (KMM/ECW), 2022 WL 4348713, at *12 (D. Minn. July 22, 2022), *report and recommendation adopted by* 2022 WL 4343060 (D. Minn. Sept. 19, 2022); *see also Angelica C. v. Immigration and Customs Enforcement*, Case No. 20-cv-913 (NEB/ECW), 2020 WL 3441461, at * 14 (D. Minn. June 5, 2020) ("With respect to the objective prong [of the deliberate indifference inquiry], the available evidence establishes that COVID-19 is a highly communicable disease that presents a potentially mortal risk, particularly for high-risk individuals such as those Petitioners with risk factors identified by the CDC."), *report and recommendation adopted by* 2020 WL 3429945 (D. Minn. June 23, 2020).

For their part, Defendants appear to acknowledge this caselaw, observing that these "early

cases" demonstrated a high level of concern for the virus. (Mem. in Supp. Summ. J. at pp. 6-7 (ECF No. 49).   But Defendants then contend – without any support – that such concern has since "waned" in the nation and community. *Id.*   Defendants also argue that Plaintiff's own actions – by refusing the COVID-19 vaccine when it was offered to him on December 3, 2021, and then later refusing medication to treat his symptoms when he later contracted COVID-19 – indicate that *Plaintiff* did not believe that COVID-19 presented a serious health risk to him personally.   This Court is not persuaded.

First, this inquiry is an objective one.   As such, Plaintiff's *subjective* beliefs about the seriousness of COVID-19 are no more relevant here than Defendants' *subjective* beliefs about the risk posed by COVID-19.   Second, and more to the point, whether society has become more accepting of the risks of COVID-19 such that it *no longer* constitutes an objective risk of harm, does not detract from society's perspective on the pandemic at the earlier time of the factual predicate of the Amended Complaint: November 19, 2021, to March 9, 2022.   Accordingly, in keeping with the established case law, the Court agrees that – for the purposes of summary judgment – the COVID-19 pandemic represented an objective risk of harm to the WCDC detainees. *See Heishman v. Butler*, Case No. 4:22-cv-04013, 2023 WL 4784001, at *11 (W.D. Ark. July 5, 2023) (recognizing the "significant health risks" associated with COVID-19 and assuming for the purposes of the summary judgment motion that "COVID-19 posed an objectively serious medical risk to Plaintiff"), *report and recommendation adopted by* 2023 WL 4771204 (W.D. Ark. July 26, 2023).

Even so, Plaintiff's claim cannot survive summary judgment unless there is a material fact dispute about whether the Defendants acted with deliberate indifference with respect to the risk of

harm COVID-19 presented.

"The subjective prong of deliberate indifference is an extremely high standard that requires a mental state of more than gross negligence." *Saylor v. Nebraska*, 812 F.3d 637, 644 (8th Cir. 2016). It "requires a mental state 'akin to criminal recklessness.'" *Id.* (quoting *Jackson v. Buckman*, 756 F.3d 1060, 1065 (8th Cir. 2014)). "The subjective component of deliberate indifference requires proof that [the defendants] actually knew of and recklessly disregarded this substantial risk of serious harm." *Butler*, 465 F.3d at 345.   But "prison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted." *Farmer v. Brennan*, 511 U.S. 825, 844 (1994). "A prison official's duty under the Eighth Amendment is to ensure 'reasonable safety.'" *Id.* (quoting *Helling v. McKinney*, 509 U.S. 25, 33 (1993)).   When confronted with claims that correctional institutions failed to protect inmates from COVID-19, moreover, several courts have found that "evidence of prison officials' reasonable preventative measures taken in response to COVID-19 precludes a likelihood of success as to the subjective element of an Eighth Amendment claim." *Amen El v. Schnell*, Case No. 20-cv-01327 (DSD/ECW), 2022 WL 1110981, at * (D. Minn. Jan. 31, 2022), *report and recommendation adopted by* 2022 WL 766402 (D. Minn. Mar. 14, 2022), *affirmed* 2022 WL 17228817 (8th Cir. Jul. 29, 2022) (listing cases).

In this case, neither party asserts any facts that Plaintiff had been diagnosed with any medical conditions that placed him at high-risk of contracting a severe case of COVID-19.   There is no dispute of material fact that WCDC COVID-19 policy requires detainees and staff *entering* the facility to be screened for COVID-19 symptoms and requires incoming detainees identified after such screening as high risk for COVID-19 to wear a mask and be isolated from the general

18

population. (Def. Ex. A11, COVID-19 Management Plan, (ECF No. 50-12).   There is also no dispute of material fact that the policy requires "environmental cleaning [ ] to follow the CDC recommended cleaning practices," *id.*, although Plaintiff asserts Defendants' efforts to clean the facility did not meet the standards set by policy. (Pl. Statement of Disputed Facts p.1 (ECF No. 71)).[10]   Further, Plaintiff asserts that "between November 18, 2021, and March 9, 2022, if an inmate met with a doctor, went to court, or even sat with an attorney separated by a glass partitian [sic], the inmate was removed from general population and placed into quarantine for 14 days." (Aff. Scharnhorst ¶ 13 (EF No. 70)).   Accordingly, there is no dispute of material fact that the Defendants have taken measures to address the risk of harm presented by COVID-19.

Rather, Plaintiff's argument is that the Defendants did not do *enough* to address the risk of harm posed by COVID-19.   Specifically, Plaintiff asserts that Defendants failed to reasonably respond to the risk of COVID-19 (and in fact displayed deliberate indifference to that risk) by failing to properly wear face coverings. (Amend. Comp. (ECF No. 7)).   This contention fails as a matter of law, however, because notwithstanding the WCDC's policy on face coverings (or lack thereof) at the time, public records show that there was no mask mandate in *any* setting in Arkansas after March 31, 2021, which is well before the timeframe alleged in the Amended Complaint.   If there was no mask mandate in the State of Arkansas – or in any correctional setting – at the time, then it cannot be said that the Defendants acted unreasonably in response to the COVID-19 pandemic *at that time* by not wearing masks or by not requiring staff to wear masks.   Certainly, if the State of Arkansas did not require the Defendants to wear masks at the time, then the

---

[10]     Plaintiff did not consecutively number the paragraphs in his Statement of Disputed Facts. *See* (ECF No. 71).   For ease of reference, this Court refers to the CM/ECF pagination at the top of each page.

Defendants' failure to wear masks (or to properly wear masks) does not rise to the level of criminal recklessness required to sustain a cause of action for "failure to protect," particularly where, as here, Plaintiff does not claim that he had been diagnosed with some health condition that made him particularly susceptible to COVID-19.[11]

      To be sure, it is possible, and perhaps even likely, that Defendants could have done more to both prevent the incidence of COVID-19 at the WCDC and its spread.   But the question for the Court to consider is whether the Defendants acted with "deliberate indifference" to the risk of harm posed by COVID-19, not whether Defendants could or should have taken other "reasonable measures to abate it." *Butler v. Fletcher*, 465 F.3d 340, 345-46 (8th Cir. 2006).[12]

---

[11]    Both parties devote significant space to describing surveillance video that Plaintiff had requested be preserved.  For example, Defendants assert that overhead surveillance video from January 15, 2022, at 6:40 pm shows "an officer entering the inmate common area while wearing a mask to hand out food trays. There is no audio." (Def. Statement of Indisp. Facts ¶ 37 (ECF No. 50)) (citing Def. Ex. A9, Video, "R-Blk; 1-15-22; 0641-0647 Hrs. (ECF No. 50-19)).   Plaintiff, by contrast, reports that "at time stamp 0:56 [of video R-BLK; 1-15-22; 0641-0647 hrs], Deputy Self is not wearing a mask." (Pl. Statement of Disp. Facts p. 7 (ECF No. 71)).   As another example, Defendants maintain that "the overhead video from January 26, 2022, reflects a view of the hallway where an officer and staff are handing out food trays while wearing masks. There is no audio." (Def. Statement of Indisp. Facts ¶ 49 (ECF No. 50)) (citing Def. Ex. A9, Video, "OS R-Blk; 1-26-22; 1231-1235 Hrs.")).   But Plaintiff maintains that this video shows "Defendant Misenheimer donning his mask in a manner in violation with policy (time stamp 3:22) wearing his mask below his nose. . .. At time stamp 5:20 it can be seen clearly that his mask is worn below his nose." (Pl. Statement of Disp. Facts p. 9 (ECF No. 71)). To the extent that there is a factual dispute about whether the WCDC defendants depicted in the surveillance videos are (or are not) wearing masks, such disputes are not material for the reasons outlined above.

[12]    Plaintiff disputes the Defendants' assertion that the WCDC responded to COVID-19 by implementing enhanced cleaning practices in accordance with CDC recommendations. (Pl. Statement of Disp. Facts at p. 1 (ECF No. 71)).   With respect to the official capacity claims, objecting to a policy is not evidence that the policy itself is unlawful. *See Butler*, 465 F.3d at 345-46 (concluding that allegations that detention center staff did not follow policy is not evidence of an unlawful policy).   Regarding the individual capacity claims, Plaintiff's entirely conclusory objection asserting that WCDC staff did not implement enhanced environmental cleaning practices is simply not sufficient to establish a material fact dispute necessary to survive summary judgment.

iii.     *Conditions of Confinement*

Although the Court believes that Plaintiff's "failure to protect" claim for failing to wear masks is properly analyzed under the Eighth Amendment "deliberate indifference" standard, *see Angelica C.*, 2020 WL 3441461 at * 14, this Court nevertheless also considers Plaintiff's allegations as a "conditions of confinement" claim under the Fourteenth Amendment.  *See also Butler*, 465 F.3d at 345 (applying the 8th Amendment "deliberate indifference" standard to claims asserting failure to protect from serious disease).

In *Bell v. Wolfish*, 441 U.S. 520 (1979), the Supreme Court held that the government may detain defendants pretrial and "may subject them to the restrictions and conditions of a detention facility so long as those conditions and restrictions do not amount to punishment, or otherwise violate the Constitution." *Id.* at 536-37. There are two ways to determine whether conditions of confinement rise to the level of punishment. First, "a plaintiff could show that the conditions were intentionally punitive." *Id.* at 538. Alternatively, "if there is no expressly demonstrated intent to punish, the plaintiff could also show that the conditions were not reasonably related to a legitimate government purpose or were excessive in relation to that purpose." *Stearns v. Inmate Srvs. Corp.*, 957 F.3d 902, 907 (8th Cir. 2020) (quoting *Wolfish*, 441 U.S. at 538-39).   "In considering whether the conditions of pretrial detention are unconstitutionally punitive, [courts] review the totality of the circumstances of a pretrial detainee's confinement." *Morris v. Zefferi*, 601 F.3d 805, 810 (8th Cir. 2010).

Here, again, there is no dispute of fact that the WCDC instituted COVID-19 protocols. Those protocols included screening persons coming into the facility, increased environmental cleaning, and the use of quarantine. *See* (Def. Ex. A11, COVID-19 Management Plan (ECF No.

50-12)).   Whether the WCDC COVID-19 Prevention Policy requires WCDC staff to wear face masks is, again, not material where, as here, public records show that there was no state-wide mask mandate in place at the timeframe alleged by Plaintiff in the Amended Complaint.   Put differently, Defendants' failure to wear masks (or to properly wear masks) could not amount to "punishment" (or an intent to punish) within the meaning of the Fourteenth Amendment when there was no longer a requirement by the State of Arkansas to wear masks.   Accordingly, Defendants' Motion for Summary Judgment on Plaintiff's claims related to the Defendants' failure to wear masks (or to properly wear masks) – whether construed as a "failure to protect" or "conditions-of-confinement" claim – should be granted.

### 3.   Verbal Comments

Plaintiff contends that when he requested that Defendants wear a mask (or properly wear a mask), he was mocked by Defendant Beck, threatened by Defendant Misenhimer, and insulted by Defendant Phipps. (Amend. Comp. p. 5 (ECF No. 7)).   Defendants contend that the facts, even when construed in the light most favorable to Plaintiff, do not amount to a constitutional violation. (Mem. Supp. of Summ. J. (ECF No. 49)). This Court agrees.

Generally, "taunts, name calling, and the use of offensive language do not state a claim of constitutional dimension." *Ford v. Stamps*, Case No. 5:19-CV-05170, 2020 WL 5995983, at *10 (W.D. Ark. Oct. 9, 2020) (citing *McDowell v. Jones*, 990 F.2d 433, 434 (8th Cir. 1993)); *see also Doe v. Gooden*, 214 F.3d 952, 955 (8th Cir. 2000) ("Verbal abuse is normally not a constitutional violation.") (citing *Martin v. Sargent*, 780 F.2d 1334, 1339 (8th Cir. 1985).   Rather, "a threat constitutes an actionable constitutional violation only when the threat is so brutal or wantonly cruel as to shock the conscious, or if the threat exerts coercive pressure on the plaintiff and the plaintiff

22

suffers the deprivation of a constitutional right." *King v. Olmsted Cnty.*, 117 F.3d 1065, 1068 (8th Cir. 1997) (internal citations omitted).

Plaintiff contends Defendant Phipps said, "blow me" and "make me" when Plaintiff requested that Phipps wear a mask. (Def. Ex. A2, Requests and Grievances, p. 37 (ECF No. 50-3)).   Plaintiff also asserts that Defendant Beck told him that he "didn't have to" wear a face mask and "taunted" Plaintiff, and that Defendant Misenhimer displayed an "arrogant attitude," a "disregard for detainee rights," and was "stubbornly antagonistic when confronted about his carelessness."  *Id.* at p. 13, 30, 31.   Even when viewed in the light most favorable to Plaintiff, these comments, and accompanying behaviors, are simply not "so brutal or wantonly cruel" as to "shock the conscious." *See Gooden*, 214 F.3d at 955 ("yelling and screaming at [elementary school] students, using foul language, telling students that their handwriting 'sucks,' telling students that 'if you had one eye and half a brain, you could do this,' calling students 'stupid,' and referring to students as 'bimbos,' 'fatso,' and the 'welfare bunch,'" not sufficient to establish a constitutional cause of action for verbal threats alone); *Hopson v. Fredricksen*, 961 F.2d 1374, 1378-79 (8th Cir. 1992) (threats of physical violence where not accompanied by actual violence or use of a deadly weapon, not sufficient to establish a constitutional violation).   This Court therefore recommends that Defendants' Motion for Summary Judgment be granted as to this claim.

### 4.  Failure To Train or Supervise

Count two of Plaintiff's Amended Complaint alleges that Chief Deputy (now Sheriff) Jay Cantrell, Major Randall Denzer, and Corporal Tom Mulvaney failed to properly train and supervise WCDC staff in the implementation and execution of the WCDC COVID-19 policy. (Amend. Comp. (ECF No. 7)).

For these Defendants to be liable under § 1983 on a "failure to train or supervise" theory, Plaintiff must show that each individual defendant "(1) had notice of a pattern of unconstitutional acts committed by subordinates; (2) was deliberately indifferent to or tacitly authorized those acts; and (3) failed to take sufficient remedial action; (4) proximately causing injury to [Plaintiff]." *Livers v. Schenck*, 700 F.3d 340, 355 (8th Cir. 2012) (quoting *Jane Doe A. v. Special Sch. Dist. of St. Louis Cnty.*, 901 F.2d 642, 645 (8th Cir. 1990) (internal quotations omitted)). The "notice standard" is "rigorous and requires proof that the supervisor had notice of a pattern of conduct by the subordinate that violated a clearly established constitutional right." *S.M. v. Krigbaum*, 808 F.3d 335, 340 (8th Cir. 2015).

As described above, because there was no mask mandate in effect in the State of Arkansas at the time, the fact dispute about whether (or the extent to which) Defendants failed to wear face masks is simply immaterial: the failure to wear masks does not amount to a "failure to protect" or "unconstitutional conditions of confinement."   Thus, there is no basis for supervisory liability for "failure to supervise and train" regarding the wearing of masks.   Defendants' Motion for Summary Judgment on this count should therefore also be granted.

**B.  "Clearly Established" Right**

Even if evidence of the Defendants' failure to wear masks (or properly wear masks), viewed in the light most favorable to Plaintiff, constitutes a "failure to protect" or "unconstitutional conditions of confinement," qualified immunity nevertheless bars Plaintiff's claims because those rights were not "clearly established" at the time.

A right is "clearly established when its contours are sufficiently clear that a reasonable official would understand what he is doing violates that right." *Ryno*, 58 F.4th at 1004 (quoting

24

*Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). "In other words, the right violated must have been established 'beyond debate.'" *Manning v. Cotton*, 862 F.3d 663, 668 (8th Cir. 2017) (citation omitted). "Courts must not define clearly established law at a high level of generality, since doing so avoids the crucial question of whether the official acted reasonably in the particular circumstances that he or she faced." *Glow In One Mini, LLC v. Walz*, 37 F.4th 1365, 1374 (8th Cir. 2022) (quoting *Bell v. Neukirch*, 979 F.3d 594, 607 (8th Cir. 2020). In determining whether a right was "clearly established, [courts] look to the state of the law at the time of the incident." *Id.* (quoting *Williams v. Herron*, 687 F.3d 971, 977 (8th Cir. 2012)).

Here, during the timeframe alleged in the Amended Complaint – November 18, 2021, until March 10, 2022 – the United States was in the midst of an "unprecedented" pandemic. *See, e.g.*, *Tate v. Ark. Dep't of Corr.*, Case No. 4:20-cv-558-BSM-BD, 2020 WL 7378805, at * 11 (E.D. Ark. Nov. 9, 2020) ("The issues and challenges posed by COVID-19 are unlike any other in the modern era. COVID-19 is, by definition, a 'novel' coronavirus."). Plaintiff identifies, and the Court has located no case law that would put the Defendants on notice that failure to wear masks consistently and properly in a correctional setting during a pandemic (irrespective of the status of the State's mask mandate at the time) would violate an inmate's constitutional rights. *See Harmon v. Harris*, Case No. 4:22-cv-00716-BRW-ERE, 2023 WL 1767578, * 4 (E.D. Ark. Jan. 10, 2023) (no clearly established right to be housed in a COVID-free environment) (listing cases), *report and recommendation adopted by* 2023 WL 1766482 (E.D. Ark. Feb. 3, 2023), *affirmed* 2023 WL 5499595 (8th Cir. May 15, 2023). Accordingly, even if Plaintiff's constitutional rights were violated, the Defendants should be entitled to qualified immunity.

25

## II.      Official Capacity Claims

Plaintiff names the Defendants in their official and individual capacities. "Official-capacity liability under 42 U.S.C. § 1983 occurs only when a constitutional injury is caused by a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may failure be said to represent official policy." *Remington v. Hoopes*, 611 F. App'x 883, 885 (8th Cir. 2015) (quoting *Gladden v. Richbourg*, 759 F.3d 960, 968 (8th Cir. 2014)). Because Plaintiff has not established a constitutional injury, Defendants' Motion for Summary Judgment on Plaintiff's official capacity claims should also be granted.

## III.      State Law Tort of "Outrage"

Finally, Plaintiff requests $50,000 in damages for "intentional infliction of emotional distress related to dangerous confinement conditions." (Amend. Comp. (ECF No. 7)).   Because the Defendants consider this request for relief as a separate cause of action pursuant to the Arkansas state law tort of "outrage," this Court will follow suit.

To establish a claim for the tort of outrage, "a plaintiff must demonstrate the following elements: (1) the actor intended to inflict emotional distress or knew or should have known that emotional distress was the likely result of his conduct; (2) the conduct was 'extreme and outrageous,' was 'beyond all possible bounds of decency,' and 'was utterly intolerable in a civilized community;' (3) the actions of the defendant were the cause of the plaintiff's distress; and (4) the emotional distress sustained by the plaintiff was so severe that no reasonable person could be expected to endure it." *Marlar v. Daniel*, 247 S.W.3d 473, 509-10 (Ark. 2007). The Arkansas Supreme Court "gives a narrow view to the court of outrage and requires clear-cut proof to establish the elements in outrage cases." *Id.* at 510 (quoting *Crockett v. Essex*, 19 S.W.3d 585

(2000)).   "Merely describing the conduct as outrageous does not make it so." *Id.*

Again, the conduct at issue is Defendants' failure to wear face coverings (or to properly wear them from November 2021 to March 2022) and to properly supervise and train WCDC staff on WCDC's face-covering policies. This conduct is neither extreme nor outrageous. *See Hamaker v. Ivy*, 51 F.3d 108, 110 (8th Cir. 1995) (citing *Tandy Corp. v. Bone*, 678 S.W.2d 312, 314 (1984)).

"Factors that bear on the determination of whether conduct is extreme and outrageous include: the conduct at issue; the period of time over which the conduct took place; the relation between plaintiff and defendant; and defendant's knowledge that plaintiff is peculiarly susceptible to emotional distress by reason of some physical or mental peculiarity." *Id.* at 111 (internal citations omitted).   In this case, as noted above, the Arkansas state-wide mask mandate was no longer in effect at the time of Plaintiff's claims. *Compare* (Exec. Order No. 21-03, Executive Order to Renew the Disaster and Public Health Emergency to Mitigate the Spread and Impact of COVID-19 (Feb. 26, 2021)) *with* (Exec. Order No. 21-07, Executive Order to Renew the Disaster and Public Health Emergency to Mitigate the Spread and Impact of COVID-19 (March 31, 2021)). Thus, even if WCDC had a policy requiring WCDC to wear masks (and it is far from clear that it did), WCDC staff's failure to comply with this policy (and WCDC supervisor's failure to enforce any such policy) could not be considered extreme or outrageous because the State of Arkansas did not require *anyone* to wear face coverings.   Put differently, considering that face coverings were no longer required in the State of Arkansas, it cannot be said that choosing not to wear a mask fell outside of "all bounds of decency."   Although it is doubtful that this conduct meets *any* of the elements of the tort of "outrage," because it clearly does not constitute "extreme" and "outrageous" conduct, Plaintiff's cause of action for outrage fails and this Court need not consider the other

three elements.

## CONCLUSION

In sum and for all the reasons outlined above, the undersigned recommends that Defendants' Motion for Summary Judgment (ECF No. 48) be **GRANTED** in all respects and that this matter therefore be **DISMISSED**.

**The parties have fourteen (14) days from receipt of the Report and Recommendation in which to file written objections pursuant to 28 U.S.C. § 636(b)(1). The failure to file timely objections may result in waiver of the right to appeal questions of fact. The parties are reminded that objections must be both timely and specific to trigger de novo review by the district court.**

RECOMMENDED this 10th day of October 2023.

*Christy Comstock*

CHRISTY COMSTOCK
UNITED STATES MAGISTRATE JUDGE

28